Charles DIGGS, Appellant,

v.

David OWENS, Superintendent and
John Daughn, Warden.

No. 86–5855.

United States Court of Appeals,
Third Circuit.

Argued Sept. 29, 1987.

Decided Nov. 6, 1987.

Thomas M. Blewitt (argued), Asst. Federal Public Defender, Scranton, Pa., Melinda C. Ghilardi, Asst. Federal Public Defender, Harrisburg, Pa., George E. Schumacher, Federal Public Defender, Pittsburgh, Pa., for appellant.

Richard A. Lewis, Dist. Atty., Yvonne A. Okonieski (argued), Deputy Dist. Atty., Harrisburg, Pa., for appellees.

Before SEITZ, GREENBERG and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

Charles Diggs appeals from the district court's denial of his petition for a writ of habeas corpus. He contends that: (1) he was improperly tried for first degree murder and kidnapping in the Court of Common Pleas for Dauphin County, Pennsylvania, in violation of Articles IV(c) and IV(e) of the Interstate Agreement on Detainers Act (IADA); (2) certain rulings of the trial judge in the criminal action denied him due process and equal protection of the law, and infringed his right to compulsory process; and (3) his attorneys, at trial and on appeal, in the criminal action were constitu-

tionally ineffective. The court has jurisdiction under 28 U.S.C. § 1291.

## I.

### Facts

In 1975, Diggs was indicted for kidnapping and first degree murder in Dauphin County but he remained at large until May 17, 1976 when federal agents arrested him in Philadelphia on unrelated charges. When the Dauphin County District Attorney learned of Diggs' arrest he forwarded capiases for the charges to the appropriate state authorities in Philadelphia and to the United States Marshal for the Eastern District of Pennsylvania. In July 1976, while he was still a federal prisoner, Diggs was convicted of bank robbery in the United States District Court in Trenton, New Jersey, and on August 3, 1976 he pleaded guilty to bank robbery in the United States District Court for the Eastern District of Pennsylvania in Philadelphia. On or about August 19, 1976, Diggs was transferred to state custody for disposition of charges in Philadelphia. On September 9, 1976, he was sentenced on the Eastern District bank robbery charges. He then was tried in the state court in Philadelphia in October and December 1976 but both cases resulted in mistrials. Subsequently, on December 28, 1976, pursuant to writs of habeas corpus *ad prosequendum* served on state and federal authorities in Philadelphia, Dauphin County acquired custody of Diggs for the first time.

After his arraignment in Dauphin County on the kidnapping and murder charges, Diggs was returned to Philadelphia for a third trial where he remained in state custody until the United States Marshal, pursuant to an order of a federal district judge, entered without the knowledge or consent of the prosecuting authorities in Dauphin County, removed him from state custody and transferred him to the Metropolitan Correctional Center in New York City. After a brief stay at the Center, the Marshal returned Diggs to federal custody in Pennsylvania. When the Dauphin County District Attorney learned that Diggs had been removed from state custody, he se-

cured another writ of habeas corpus *ad prosequendum* so that Diggs would be available for the scheduled trial date of February 14, 1977. The writ was served on the federal authorities who honored it and returned him to Dauphin County where he remained until the completion of his trial. The trial, however, did not start until April 18, 1977 due to a defense requested postponement and disposition of pretrial motions.

At the trial a prosecution witness, Jack Singer, testified that he had been a party to a conversation among Diggs, Martha McIver and Kenny Shank in which Diggs admitted his role in the murder. Diggs' attorney, who was surprised by this testimony, obtained a continuance to enable him to locate McIver who was under subpoena and Shank who was not. McIver appeared at the trial and contradicted Singer's testimony but Diggs' attorney asked for an additional continuance so that Shank, who was incarcerated, apparently in the Philadelphia area, could be brought to court. This request, however, was denied and thus the trial was completed without him.

After the completion of the prosecution's case, Diggs moved for a mistrial arguing that Dauphin County detectives had coerced his brother into silence depriving him of exculpatory testimony. In support of this motion Diggs produced a letter, allegedly written by his brother after an encounter with several Dauphin County detectives, stating that the detectives had warned his brother that if he testified he would be prosecuted for a robbery. Diggs' brother was present at the trial but when called by Diggs as a witness he invoked his Fifth Amendment privilege against self-incrimination and refused to testify on advice of his attorney who was also present. The judge upheld the claim of privilege and denied a request by Diggs' attorney for permission to ask the witness whether he was asserting his privilege in response to official intimidation. Diggs was convicted and received a life sentence for first degree murder and a consecutive ten to 20 year term for kidnapping. His motions for arrest of judgment and a new trial were denied in a reported opinion. *Commonwealth v. Diggs*, 100 Dauph. 318 (1978).

Diggs, represented by a retained attorney, appealed to the Pennsylvania Superior Court. Diggs alleges that he instructed this attorney to raise the alleged ineffectiveness of trial counsel as an issue but the attorney did not do so. While Diggs himself filed a brief dealing with this issue, the Superior Court nevertheless affirmed the convictions and sentences. *Commonwealth v. Diggs*, 273 Pa.Super. 121, 416 A.2d 1119 (1979). Thereafter, Diggs obtained a new attorney and instructed him to argue the ineffectiveness of both trial counsel and his first appellate counsel in a petition for review before the Pennsylvania Supreme Court. Even though this second appellate counsel failed to argue the ineffectiveness issue, Diggs' petition was granted and a third appellate counsel was appointed to argue his appeal. On June 17, 1982, however, the Pennsylvania Supreme Court dismissed the appeal as improvidently granted. 498 Pa. 360, 446 A.2d 600 (1982). This habeas corpus action followed.

## II.

### Interstate Agreement on Detainers Act (IADA)

The IADA, to which Pennsylvania and the United States are parties, establishes procedures by which a member state, including the United States, may procure a prisoner from another member jurisdiction for trial.[1] The IADA may be triggered when the state in which the trial is to be had, the receiving state, lodges a "detainer" with the state in which a prisoner is incarcerated, the sending state. The prisoner is transferred when the receiving state presents a "written request for temporary custody" to the appropriate authorities in the sending state.[2] Once the prison-

---

1. 18 U.S.C.App. § 2; 42 Pa.Cons.Stat.Ann. § 9101 (Purdon 1982).

2. The IADA also contains provisions for the prisoner to request a final disposition of a complaint, indictment or information against him but we are not concerned with those provisions on this appeal.

er arrives in the receiving state, Article IV(c) of the IADA requires that his trial start within 120 days. The IADA further provides in Article IV(e) that if the prisoner is returned to the sending state before trial, the charges against him must be dismissed. Diggs contends that these speedy trial and anti-shuttling provisions were violated in his prosecution.

Diggs relies largely on *United States v. Mauro*, 436 U.S. 340, 349, 98 S.Ct. 1834, 1841–42, 56 L.Ed.2d 329 (1978), in which the Supreme Court held that a writ of habeas corpus *ad prosequendum* issued by a federal district court is not a "detainer" for purposes of the IADA although, when preceded by a proper detainer, the writ can serve as a "written request for temporary custody" which, if honored, will trigger the speedy trial and anti-shuttling provisions of the IADA. Building his argument on *Mauro*, Diggs contends that the Dauphin County capiases were detainers under the IADA so that his transfer to that county pursuant to the writ of habeas corpus *ad prosequendum* triggered the IADA. Thus, in his view, his return to federal custody after his arrival in Dauphin County required the dismissal of the kidnapping and murder indictments. *See Casper v. Ryan*, 822 F.2d 1283, 1289 n. 9 (3rd Cir.1987). He further contends that he is entitled to relief because his trial did not commence within 120 days of his transfer to Dauphin County.

Diggs' argument, however, faces one major obstacle; namely that in *United States v. Williams*, 615 F.2d 585, 592–93 (3rd Cir.1980), we ruled *Mauro* is not retroactive. *See also Brown v. Mitchell*, 598 F.2d 835, 837–39 (4th Cir.1979), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 939, 67 L.Ed. 2d 109 (1981). Diggs seeks to circumvent *Williams* by urging that we abandon that decision on the basis of *Griffith v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In *Griffith* the Supreme Court announced that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." —— U.S. at ——, 107 S.Ct. at 716. Diggs reasons that since his conviction was pending on direct review when *Mauro* was decided in 1978, that case should now be given retroactive effect in this habeas corpus case.

*Griffith*, however, was concerned with the retroactive application of the constraints on a prosecutor in jury selection established in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), and thus dealt with constitutionally mandated procedures. The fact that *Griffith* involves constitutional law is demonstrated by the Court's indication that it was reviewing the three pronged analysis of claims for retroactivity of "new constitutional rules of criminal procedure" adopted 21 years earlier in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). *See Griffith*, —— U.S. at ——, 107 S.Ct. at 712. Ultimately the court concluded that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." —— U.S. at ——, 107 S.Ct. at 713. Accordingly, we hold that *Griffith* should be confined to constitutional rules of criminal procedure and thus does not require retroactive application of new procedural decisions not constitutionally grounded.

There is no reason to apply the *Griffith* constitutional retroactivity holding here as the IADA is "nothing more than a set of procedural rules" and remains distinct from the rights it was fashioned to serve. *United States v. Palmer*, 574 F.2d 164, 167 (3rd Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978). Therefore, a violation of the IADA is not an infringement of a constitutional right.[3] Accordingly we adhere to *Williams*.

---

3. Of course, a state's delay in bringing a defendant to trial could violate both the IADA and the defendant's rights to a speedy trial. On the record here, however, we see no foundation to support a finding that Diggs' constitutional rights were infringed. In view of our result, we need not consider whether *Griffith* itself should be applied retroactively in a habeas corpus case not involving a direct appeal from a conviction.

Diggs next argues that this court recognized a writ of habeas corpus *ad prosequendum* as a detainer under the IADA in *United States ex rel. Esola v. Groomes*, 520 F.2d 830 (3rd Cir.1975), and thus, even if we do not apply *Mauro*, we should evaluate his IADA claim under *Groomes*. He then concludes that when he was transferred to federal custody after his arraignment in Dauphin County the anti-shuttling provisions of the IADA were violated entitling him to a dismissal of the Dauphin County charges.

We reject Diggs' *Groomes* contentions. In *Groomes* we vacated a judgment dismissing a habeas corpus petition and remanded the matter for further proceedings upon finding that the petitioner had stated a claim under Article IV(e) of the IADA. In reaching that result, we rejected a narrow reading of a "detainer" as a "hold order" and suggested that a writ of habeas corpus *ad prosequendum*, when used to secure a defendant on bail in another jurisdiction, might constitute a detainer under the IADA. 520 F.2d at 838. However, we did not expressly recognize a writ of habeas corpus *ad prosequendum* as a detainer under the IADA until our decision in *United States v. Sorrell*, 562 F.2d 227 (3rd Cir.1977) (*in banc*), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978), which we filed after Diggs' conviction. We indicated that *Sorrell* would not be applied retroactively, 562 F.2d at 231 n. 6b, and, in fact, it has not been applied retroactively by the courts within this Circuit. *See United States v. Boyd*, 437 F.Supp. 519 (W.D.Pa.1977), *aff'd without opinion*, 578 F.2d 1376 (3rd Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1979). Finally, on this point, we note that the authority of *Sorrell* has been undermined by the holding in *Mauro* that a writ of habeas corpus *ad prosequendum* issued by a federal district court is not a detainer under the IADA.[4]

■ In summary we conclude that the writs of habeas corpus *ad prosequendum*

from Dauphin County cannot be characterized as "written requests for temporary custody" through a retroactive application of *Mauro* nor as "detainers" through a retroactive application of *Sorrell*. Thus, Diggs' transfer to state custody for the Dauphin County trials did not trigger the speedy trial and anti-shuttling provisions in Articles IV(c) and IV(e) of the IADA. Consequently, we reject his claims under the IADA.

### III.

### Rulings by the Trial Court

Diggs contends that the Dauphin County trial court denied him due process of the law, equal protection of the law and the right to compulsory process by denying his discovery requests, by refusing to continue the trial until inmate witness Kenny Shank could appear, and by refusing to permit his counsel an opportunity to question his brother concerning his reasons for invoking the Fifth Amendment.

### A.

### Discovery

■ Prior to the trial, Diggs unsuccessfully sought to obtain the identities of the prosecution's witnesses and discovery of all physical evidence and scientific tests. He asserts that if he had been granted the discovery he would not have been surprised by Singer's evidence and would have been prepared for trial. We see no basis to grant Diggs relief by reason of these rulings. It is well settled that there is no general constitutional right to discovery in a criminal case although the prosecution has the "duty under the due process clause to insure that 'criminal trials are fair' by disclosing evidence favorable to the defendant upon request." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30 (1977); *see Pennsylvania v. Ritchie*, — U.S. —, —, 107 S.Ct. 989,

4. Though Diggs also seeks relief by reason of his federal court appearance on September 9, 1976, we do not see how his sentencing on that day can affect the Dauphin County proceedings as a writ of habeas corpus *ad prosequendum* from that county had not been honored and, though the record is unclear on this point, probably even issued at that time.

1003, 94 L.Ed.2d 40 (1987). Here, Singer's statement was certainly not favorable to Diggs and there is no basis in the record to conclude that the prosecution suppressed physical evidence or scientific tests favorable to Diggs.

### B.

### Continuance

We see no merit in Diggs' claim that the trial court erred when it refused to continue the trial until Kenny Shank could be brought to court. An application for a continuance is addressed to the sound discretion of the trial judge. Consequently, a denial of a continuance can be reversed only for abuse of discretion. *Paullet v. Howard*, 634 F.2d 117, 119 (3rd Cir.1980); *Commonwealth v. Howard*, 466 Pa. 445, 447, 353 A.2d 438, 439 (1976). Denial of a continuance to secure an absent witness is not an abuse of discretion "[i]f testimony which an absent witness would give is merely cumulative or available from another source." *Howard*, 466 Pa. at 447, 353 A.2d at 439. Since McIver was called to rebut Singer's claim that Diggs had admitted his part in the crimes in their presence, Shank's testimony could, even if helpful to Diggs, merely have corroborated that of McIver. Thus, Shank could offer no new information essential to Diggs' defense and the trial court did not abuse its discretion in proceeding without him. Therefore, the judge's refusal to grant the continuance affords Diggs no basis of relief.

### C.

### Compulsory Process

Diggs argues that his Sixth Amendment right to compulsory process was abridged by the trial court's refusal to allow his attorney to question his brother, Martin Diggs, about his alleged intimidation by Dauphin County officials which Diggs claimed prevented his brother from testifying. We, however, see no Sixth Amendment violation in this ruling. In general a defendant's Sixth Amendment right of compulsory process gives way when a witness he has subpoenaed invokes his Fifth Amendment privilege against self-incrimination. *United States v. La Duca*, 447 F.Supp. 779, 786 (D.N.J.), *aff'd sub nom. United States v. Rocco*, 587 F.2d 144 (3rd Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). However, if the claim of privilege is precipitated solely by governmental interference or intimidation the defendant is denied due process of law. *United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir.), *reh'g denied*, 786 F.2d 644 (5th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 269, 93 L.Ed. 2d 246 (1986). *See also United States v. Morrison*, 535 F.2d 223, 226–27 (3rd Cir. 1976). Here, the trial court halted inquiry into Diggs' allegations of witness intimidation upon determining that Martin Diggs had legitimate grounds for invoking his right against self-incrimination. If the court allowed questioning of Martin Diggs regarding his reasons for remaining silent the examination could have opened the door to incriminating evidence concerning the reason the alleged intimidation had succeeded in silencing him. Martin Diggs' legitimate concern about self-incrimination thus outweighed his brother's right to compulsory process.

### IV.

### Ineffective Assistance of Counsel

Diggs claims that his Dauphin County trial counsel and his first and second state appellate attorneys were prejudicially ineffective. The standards against which we consider these claims are well defined. To obtain habeas relief under the Sixth Amendment on a claim of ineffective assistance of counsel, a petitioner must prove both serious attorney error and prejudice. *Kimmelman v. Morrison*, 477 U.S. 365, ——, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed. 2d 674 (1984); *see also McNeil v. Cuyler*, 782 F.2d 443 (3rd Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 654, 93 L.Ed.2d 709 (1986). An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the

benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065. Nevertheless, if "from counsel's perspective at the time of the alleged error and in light of all the circumstances" it appears that counsel's actions were unreasonable, the court must consider whether that error had a prejudicial effect on the judgment. *Kimmelman,* 477 U.S. at ——, 106 S.Ct. at 2586. Success on a Sixth Amendment claim of ineffective assistance of counsel requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

## A.

### Trial Counsel

■ Diggs seeks to show that trial counsel prejudiced him by failing to object to the imposition of consecutive sentences for first degree murder and kidnapping, by failing to move for a dismissal on the basis of Article IV(c) of IADA in addition to Article IV(e), and by advising him that if his wife testified she could be impeached by reason of her refusal to testify when called before the grand jury considering his indictment.

Diggs' argument regarding the sentence is derived from the Fifth Amendment's double jeopardy provisions which prohibit multiple punishments for the same offense and which are made applicable to the states through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 787, 89 S.Ct. 2056, 2058, 23 L.Ed.2d 707 (1969). He contends that the consecutive sentences for kidnapping and first degree murder constitute multiple punishments for a single offense and that trial counsel erred by failing to object to them. In support of his argument he cites *Commonwealth v. Tarver,* 493 Pa. 320, 426 A.2d 569 (1981), a case in which the Pennsylvania Supreme Court

found a violation of the protections against double jeopardy in the imposition of consecutive sentences for robbery and felony murder.

We find no substantive merit in Diggs' double jeopardy contentions. *Tarver* was predicated on the court's finding that the robbery was a constituent element of the felony murder so that the offenses for which the defendant was sentenced were not discrete. Thus the consecutive sentences imposed constituted multiple punishments for one offense. 493 Pa. at 324–26, 426 A.2d at 571–72. Here, however, each offense had an element not included in the other as the kidnapping charge, but not the first degree murder charge, required proof of unlawful removal of the victim from the place where she was found or her unlawful confinement for a substantial period in a place of isolation, *see* 18 Pa.Cons.Stat.Ann. § 2901(a) (Purdon 1983), and the first degree murder charge, unlike the kidnapping charge, required proof of an intentional killing. *See* 18 Pa.Cons.Stat.Ann. § 2502(a) (Purdon 1983). Thus the offenses are discrete for sentencing purposes, *see United States v. Woodward,* 469 U.S. 105, 105 S.Ct. 611, 83 L.Ed.2d 518 (1985). Inasmuch as Diggs' double jeopardy claim had no basis in law, his trial counsel did not err by failing to raise it.[5]

In pretrial motions in Dauphin County, Diggs' trial counsel moved for dismissal on the basis of violations of the anti-shuttling provision in Article IV(e) of the IADA. He did not, however, challenge the proceedings on the basis of the speedy trial provision in Article IV(c). Inasmuch as we have determined that Diggs' IADA challenges are without merit, trial counsel's failure to move to dismiss on the basis of Article IV(c) did not deprive Diggs of the effective assistance of counsel.

■ Diggs claims that trial counsel erroneously discouraged him from calling his wife as an alibi witness by advising him that her refusal to testify before the grand

---

5. The indictment returned against Diggs is not part of the record on this appeal. We note, however, that he does not suggest that he was convicted of felony murder which at one time

could be first degree murder in Pennsylvania, *see Tarver,* 493 Pa. at 323, 426 A.2d at 571, but which now is second degree murder, *See* 18 Pa.Cons.Stat.Ann. § 2502(b) (Purdon 1983).

jury could be used to impeach her at trial. He asserts that he discussed the matter of his wife's testimony with his attorney and he and his attorney made a decision not to call her. We are satisfied from our review of the matter that the decision not to call her was strategically sound, even if it was based on an erroneous assumption. *See Salazar v. Estelle,* 547 F.2d 1226, 1227 (5th Cir.1977). Obviously her testimony would have appeared self-serving and in this case in which there were no eyewitnesses connecting Diggs to the crimes, presenting her might have caused the jury to focus its attention on a defense that seemed contrived rather than on the possible weakness of the state's case. In any event the right to effective assistance of counsel does not guarantee that an attorney will never err. *Ibid.* Here we conclude that trial counsel did not so upset the adversarial balance between defense and prosecution that Diggs was denied a fair trial and effective assistance of counsel. *Kimmelman,* 477 U.S. at ——, 106 S.Ct. at 2583.

### B.

#### Appellate Counsel

We reject Diggs' contention that he was denied effective assistance of counsel on his appeal to the Superior Court which he predicates on his attorney's failure to urge his right to a reversal on the basis of violation of Article IV(e) of the IADA and his failure to raise additional issues which Diggs directed him to pursue. Based on our review of the matter we are satisfied that Diggs could not have been prejudiced by the attorney's conduct as there were no meritorious grounds for appeal.

Finally we see no merit in Diggs' contention that his second appellate counsel was constitutionally inadequate by reason of his failure to raise the ineffectiveness of either his trial or first appellate counsel as we have determined that they were constitutionally adequate and their actions did not prejudice Diggs.

### V.

For the reasons stated above, we will affirm the District Court's denial of Diggs' petition for habeas corpus.